

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-13-00177-CR

---

DATAURUS DENZELL GOTCHER, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1323177

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss
Dissenting Opinion by Justice Moseley

## O P I N I O N

Two very vivid, and dramatically different, pictures were painted by opposing witnesses in the Hopkins County jury trial of Dataurus Denzell Gotcher on a charge of sexual assault. The narrative sponsored by the State depicted a violent struggle between Gotcher and Janie Lynn Ragsdale in Ragsdale's house Tuesday, January 8, 2013, ending in Gotcher's sexual assault of Ragsdale. The opposing narrative from Gotcher and allied witnesses, notably Gotcher's cousin, Tacka Gotcher, depicted consensual sexual activity between Ragsdale and Gotcher two days earlier in the apartment of Gotcher's cousin. The jury believed the State's narrative, convicted Gotcher of sexually assaulting Ragsdale, and assessed a twenty-year sentence.[1]

In Gotcher's sole issue on appeal, he contends that the trial court erred in excluding testimony by Tacka about one particularly graphic part of the Sunday narrative, oral sex. Gotcher argues on appeal that the trial court should have allowed Tacka's testimony that, on Sunday, Ragsdale performed oral sex on Gotcher. Gotcher claims this was necessary so the jury could consider it when weighing his claim that Ragsdale was not sexually assaulted Tuesday but was, instead, a willing participant at that time. While we find that excluding the evidence was error, we find the error harmless.

Gotcher and Ragsdale first met Sunday, January 6, 2013, when they were among several people who had gathered at Tacka's apartment. Ragsdale acknowledged having consumed Xanax and smoked marihuana that day. Ragsdale's two-year-old son was present while she

---

[1]*See* TEX. PENAL CODE ANN. § 22.011 (West 2011). The trial court sentenced Gotcher accordingly.

2

engaged in these intoxicating activities; the son was playing with Tacka's gerbils.[2]  Ragsdale decided to purchase the gerbils for that son.  Gotcher helped Ragsdale carry the gerbils and Ragsdale's car seat to the apartment of Matthew Brooks, Ragsdale's friend.  Brooks testified Ragsdale told him she was trying to get rid of Gotcher because he was bothering her.

The following day, Gotcher accompanied Marcus Wells to the house Ragsdale shared with her boyfriend, bringing more accoutrements for the gerbils, as well as marihuana, which the three smoked in Ragsdale's garage.[3]

Ragsdale testified that Gotcher sent her several text messages on Monday, after getting Ragsdale's number from Tacka.  She said most of the messages were just casual or chatty in nature,

> [n]othing out of line except one time, one text . . . . He wanted to -- he asked if he could come over one night when my boyfriend was at work, and something about baby -- I can't remember exact details.  I did take Xanaxes on Monday, too -- baby oil and wanting to be with me and things like that.  And I told him don't -- not to text my phone anymore, don't call my phone anymore, please; I can't do that.

Ragsdale indicated that, although she did not respond further to Gotcher's messages, he continued to send them.

Ragsdale testified that she was surprised when Gotcher knocked on the front door of the house about 10:00 p.m. Tuesday night.  She indicated that it was cold and raining that night and that Gotcher told her he was waiting for a ride.  Although she indicated that Gotcher could wait for his ride in the garage, he entered the house against her will.  Then, according to Ragsdale, he

---

[2]Some witnesses called them gerbils, some called them hamsters.

[3]Wells, though, testified Ragsdale supplied the marihuana.  Wells also said he had the impression they were expected and Ragsdale was not surprised to see them at her home.

suggested that, since her boyfriend was absent, they just go back in the bedroom   Then, when she resisted that idea, Gotcher said, "Either you're going to give it to me or I'm going to take it." Ragsdale testified that she apologized to Gotcher for any mixed signals or indications of interest in him that she might have given, and told him she was not "th[at] kind of woman."  She said she was crying, and Gotcher said, "[A]t least let me out the back door."  Ragsdale complied by taking him to the back door to let him out, but, instead of exiting the house, he grabbed her. Ragsdale testified that she resisted strongly, saying she believed that she knocked out one of his teeth in the ensuing struggle and believed that she heard him spit one of his teeth out.[4]

Ragsdale testified that Gotcher wrestled her to a bed, where she continued to attempt to ward him off by kicking him.  She said he nevertheless pulled off her sweat pants and ripped off her panties.  Continuing her attempts to dissuade him, she told Gotcher that she had human papilloma virus (HPV); he responded that he did not care.  She asked him to put on a condom and thought she could distract him while he put it on.  She said Gotcher kept telling her to cooperate.  She indicated that, despite her efforts and protestations, Gotcher succeeded in accomplishing the sex act, but she was able to push him off her immediately before he ejaculated, causing him to ejaculate on the bed.  Ragsdale also said that she threw the ripped panties away and that the trash was collected three days later, thus explaining why the panties were not found by police.  Although Ragsdale told an officer that she knocked out one of

---

[4]No tooth was found in the room.  Trial occurred about five months after the incident, and Gotcher's mouth was shown to the jury, apparently revealing no missing teeth.   Gotcher testified he was not missing any teeth and had not been treated by a dentist since his arrest, about nine days after the event on Tuesday night.

4

Gotcher's teeth, the officer did not look for it, and Ragsdale's boyfriend looked for, but could not find, it.

Gotcher's version of events differed radically. He concurred with Ragsdale that they had first met Sunday, but his account of the events was otherwise substantially different. He indicated that Ragsdale initiated physical contact between the two by "rubbing on" him. He said this activity started in the dining room and hallway and that she "dropped her clothes in front of [him]," and showed him pictures, on her phone, of her body. He said that the two of them then went to a bedroom where Ragsdale performed fellatio. Gotcher said that he did, indeed, go to Ragsdale's house the next day. However, he said that this visit was because Ragsdale had called him on the telephone to invite him and that, when he arrived, they stood in the garage and she began, once again, to "rub on" him. Gotcher indicated that Ragsdale called him on Tuesday, and invited him to come to her house at a particular time and to bring a condom with him. Gotcher said that, when he arrived, Ragsdale invited him into the house, whereupon the pair of them retired to the back room and engaged in consensual sex. He said that Ragsdale told him to "hurry up before [Ragsdale's boyfriend] came home." He said that no clothes ripping occurred and that she did not knock out his tooth.

Reputation or opinion evidence of the prior sexual behavior of a sexual assault victim is inadmissible. TEX. R. EVID. 412(a). Further, unless the conduct falls within certain specified categories, specific instances of past sexual behavior of such a victim is likewise inadmissible. TEX. R. EVID. 412(b). One of the enumerated exceptions applies where "past sexual behavior with the accused . . . is offered by the accused upon the issue of whether the alleged victim

5

consented to the sexual behavior which is the basis of the offense charged." TEX. R. EVID. 412(b)(2)(B). If such an exception to the exclusionary rule applies, the proponent of the proffered evidence must still demonstrate that the evidence's "probative value outweighs the danger of unfair prejudice." TEX. R. EVID. 412(b)(3).

In his case-in-chief, Gotcher introduced testimony from his cousin, Tacka,[5] who described Sunday's events at her apartment. Although Gotcher and Ragsdale had just met on that occasion, Tacka said that Ragsdale was "all over [Gotcher] . . . . Like physical all over him, touching him, had her hands in his pants." She also said the couple went into Tacka's bedroom. At this point in the testimony, Gotcher advised the trial court at a bench conference that he was about to elicit testimony from Tacka that she had seen Ragsdale as she performed oral sex on Gotcher, and Gotcher wanted to make certain that he complied with the order on the State's motion in limine. In essence, Gotcher was seeking to introduce evidence of what he claimed was a previous sexual encounter to shore up his claim of consent to Tuesday's encounter in reliance on Rule 412(b)(2)(B) of the Texas Rules of Evidence, which allows evidence of past sexual behavior with the accused as bearing on "whether the alleged victim consented to the sexual behavior which is the basis of the offense charged." TEX. R. EVID. 412(b)(2)B).

On the State's objection that such evidence was not relevant, the trial court excused the jury and read Rule 412 of the Texas Rules of Evidence aloud. Gotcher's attorney explained that, other than Anastasia Ricker who might testify to seeing Ragsdale "rubbing on [Gotcher]," counsel did not at that time anticipate any other testimony, beyond that of Tacka, regarding

---

[5]At the time of Tacka's testimony, Gotcher had not yet taken the stand.

specific sexual acts between Ragsdale and Gotcher.[6] The trial court ruled that Gotcher could not present Tacka's testimony describing oral sex by Ragsdale on Gotcher for various reasons, including "[t]he issue of consent is not squarely before the Court," Ragsdale's testimony denying flirtatious behavior with Gotcher had already been impeached, and "the probative value of [the testimony concerning oral sex] would be greatly outweighed by the danger of unfair prejudice." *See* TEX. R. EVID. 412(b)(3).

Later, when Gotcher took the stand, he tried to bring up the alleged interlude with Ragsdale from Sunday afternoon. Again, the trial court did not believe consent had yet been sufficiently raised. At this point, defense counsel asked Gotcher about the Tuesday night sexual encounter, including Gotcher's testimony that (1) nothing in Ragsdale's behavior made him think the act was not consensual; (2) she told him to bring, and then use, a condom; and (3) she told him when to arrive. Only after Gotcher admitted that the Tuesday sexual encounter had occurred, but he believed it had been consensual, was he allowed to give his version of events from the preceding Sunday, that Ragsdale had been rubbing on him, that she removed at least some of her clothes, that she showed him pictures of her body using her phone, and that she then "pulled out [his] [penis] and started performing oral sex on [him]."

Gotcher's appeal challenges the trial court's exclusion of Tacka's testimony that, on Sunday, Ragsdale performed oral sex on Gotcher. We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard, and we will not disturb the trial

---

[6]We make note of this as an indication that, at that moment in the trial, it appears either that the defense did not anticipate having Gotcher testify or did not take into account that his testimony would include his relation of the story about fellatio.

7

court's ruling if it is within the zone of reasonable disagreement. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Smith v. State*, 401 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd).

Contrary to the trial court's statements that "consent [was] not squarely before the Court" and needed to be "more prominently before this jury" to warrant admission, we find that whether Ragsdale consented to the sexual encounter Tuesday night had already been raised when Gotcher sought to admit Tacka's testimony. To that point, (1) Gotcher had alleged in opening argument that the evidence would show Ragsdale was having an affair, (2) through questioning of State's witnesses, Gotcher had pointed out that Ragsdale waited several days to report the alleged assault, and (3) there was no evidence of visible marks on Ragsdale that would have usually been present had she attempted to ward off such an assault. The trial court and the State, in statements outside the jury's presence, both indicated the day before Tacka's proffered testimony that consent was at issue. Indeed, these comments arose during a discussion of whether Gotcher's counsel had violated a motion in limine granted to the State wherein it sought to bar reference to any statement that Gotcher had made to law enforcement. The State vigorously fought to keep this statement, in which it appears that Gotcher acknowledged having engaged in sexual intercourse with Ragsdale on Tuesday night, from the jury. The State, before Tacka's testimony was offered, asked Brooks and Ragsdale if Ragsdale had kissed or flirted with Gotcher or sat in his lap. The portion of Tacka's testimony which was allowed (that she had observed Ragsdale physically touching Gotcher, including having "her hands in his pants," and then observed the two go into a bedroom together) established that Gotcher was raising the defensive theory that

8

Ragsdale's acts on Sunday should have been considered in assessing whether the sexual liaison Tuesday night was consensual. Consent was at issue[7] in this trial even before the commencement of Tacka's testimony, and it was error to limit her testimony on the basis that it was not.

The other rationale expressed by the trial court for excluding Tacka's testimony regarding oral sex dealt with weighing the probative value of her testimony against its prejudicial effect. *See* TEX. R. EVID. 412(b)(3).

> A trial judge has broad discretion in admitting or excluding evidence. A trial judge, however, may exercise . . . discretion in excluding evidence only when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, by considerations of undue delay, or needless presentation of cumulative evidence.

*Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999) (citing TEX. R. EVID. 403).[8] It is presumed that the probative value of offered evidence will outweigh any prejudicial effect. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). "Probative value" refers to how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation coupled with the proponent's need for that item of evidence. *Casey*

---

[7]It is true that, following the trial court's ruling that the issue of consent was "not squarely before the Court" and needed to be "more prominently before this jury," the court promised to "revisit that issue if . . . the issue comes forward; that is, that there was an acknowledgment of -- of sexual intercourse." Gotcher did not re-urge his offer of Tacka's testimony after the defendant himself testified to the intercourse. However, this does not change the fact that, at the time of Tacka's testimony, consent was very much at issue.

[8]Although *Mozon* dealt with a Rule 403 complaint, we find that its reasoning is also appropriate for a 412 balancing situation. *See Miles v. State*, 61 S.W.3d 682, 687 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (citing *Mozon* and applying abuse of discretion standard to find evidence excluded under Rule 412 more probative than prejudicial); *see also Stephens v. State*, 978 S.W.2d 728, 732–33 (Tex. App.—Austin 1998, pet. ref'd) ("The function of the balancing test of Rule 412(b)(3) is generally consistent with that under Rule 403," but noting "[t]he general balancing test under Rule 403 weighs in favor of the admissibility of evidence, while Rule 412(b)(3) weighs against the admissibility of the evidence").

*v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "Unfair prejudice" refers to a tendency to cause a decision to be made on an improper basis; evidence may be unfairly prejudicial if it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id*. at 879–80. In light of the policies underlying Rule 412, the unfair prejudice language contemplates prejudice not only to the State, but also to the victim, who will potentially be stigmatized if the defendant is able to introduce evidence of prior sexual behavior. *See Stephen v. State*, 978 S.W.2d 728, 733 (Tex. App.—Austin 1998, pet. ref'd). The trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Montgomery*, 810 S.W.2d at 379–80. The mere fact the trial court may decide an evidentiary matter differently than would an appellate court does not render the ruling an abuse of discretion. *Id.* We will not reverse the trial court's ruling if it was within the zone of reasonable discretion. *Id.* at 391.[9] The proponent of evidence in a Rule 412 setting bears the burden of establishing that the probative value outweighs the danger of unfair prejudice. *Stephens*, 978 S.W.2d at 733.

In *Miles v. State*, 61 S.W.3d 682, 687 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd), the trial court was found to have abused its discretion in precluding cross-examination of the victim or introduction of other evidence of her prior sexual history. The victim testified that Miles was the only person with whom she had engaged in sex. The proffered, but excluded, evidence was that the victim had told others that she had engaged in sex with two other

---

[9]Trials involving sexual assault "are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or otherwise corroborative evidence." *Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009). Addressing a Rule 403 matter, the Texas Court of Criminal Appeals stated, "[T]he Rules of Evidence, especially Rule 403, should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such 'he said, she said' cases." *Hammer*, 296 S.W.3d at 562.

individuals. Miles denied having sex with the victim. The excluded evidence was critical to Miles' defense, and the jury was not allowed to consider that evidence in gauging the victim's credibility. The appellate court held that the excluded evidence was more probative than prejudicial and that its exclusion was an abuse of discretion on the part of the trial court.

The accused in *Hood v. State*, 944 S.W.2d 743 (Tex. App.—Amarillo 1997, no pet.), sought unsuccessfully to present evidence of the thirteen-year-old complainant's prior sexual activities on the rationale that the prior sexual activity could have accounted for healed tears in the complainant's hymen. Evidence had already been allowed regarding the victim's pregnancy at the age of fifteen, of her unmarried status, and her intention not to marry the father of the child. Thus, the risk of unfair prejudice by way of informing the jury of the complainant's prior sexual activities had already been introduced. Further, the State's theory was that Hood caused the hymenal tears. The nurse who examined the complainant and to whom the complainant divulged her other sexual activities said in the offer of proof that the date the child gave of the other sexual act could have corresponded to the healed status of the tears. The exclusion of the evidence was ruled an abuse of discretion. *Hood*, 944 S.W.2d at 745–47; *see also Reynolds v. State*, 890 S.W.2d 156 (Tex. App.—Texarkana 1994, no pet.).

In the case at bar, Gotcher's defensive theory that was expressed to the jury from the outset of the trial was that Tuesday's sexual encounter between Ragsdale and Gotcher was consensual. He sought to introduce testimony from Tacka that she had seen Ragsdale performing oral sex on Gotcher two days earlier. This evidence was germane to the central issue

11

of the case. It was "critical evidence,"[10] and, thus, probative. It is true that Gotcher adduced the same evidence via his own testimony; but he still had a real need for this testimony, as it could have benefited his defense for the jury to hear it from an independent source, even if that witness was his cousin. As for the danger of unfair prejudice to Ragsdale, the jury had already heard, without objection, Tacka's testimony that Ragsdale was "all over" Gotcher, that she had her hands in his pants, and that she thereafter accompanied Gotcher into the bedroom. After the trial court's ruling, Anastasia Ricker would describe similar, albeit less graphic, interactions between Ragsdale and Gotcher, on that Sunday. Any danger of unfair prejudice to Ragsdale, in the form of the jury's opinion of her or her credibility, was outweighed by the probative nature of this evidence, which was very important to Gotcher's defensive theory. Tacka's testimony about seeing Ragsdale administer oral sex to Gotcher had probative value which outweighed the danger of unfair prejudice. It was error to exclude it.

We must now assess for harm the error in excluding the evidence. Generally, errors resulting from admission or exclusion of evidence are nonconstitutional.[11] *See Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). However, if the precluded evidence forms a vital

---

[10]*Miles*, 61 S.W.3d at 687.

[11]The type of error determines the harm analysis:

> (a) Constitutional Error. If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

> (b) Other Errors. Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

TEX. R. APP. P. 44.2.

12

portion of the defendant's case, the error may be of constitutional magnitude. *Id.*; *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).

> Exclusion of evidence might rise to the level of a constitutional violation if: (1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or (2) a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense.

*Walters*, 247 S.W.3d at 219.

We conclude that this error does not rise to the constitutional level. In *Walters*, the defendant was prohibited from offering a second 9-1-1 recording for the jury to hear. The State offered a recording of the first emergency call and presented a theory that, immediately after the shooting, Walters had made no explanation for having shot his own brother, the victim. The jury was not allowed to hear the second emergency call in which Walters said he had shot his brother in self-defense. *Id.* at 220–21. The Texas Court of Criminal Appeals found that Walters was, nevertheless, able to present his defense through his and other witnesses' testimony, which described the history of animosity between the siblings. *Id.* at 221–22. The court thus found the error to be nonconstitutional. *Id.* at 222; *see also Valle v. State*, 109 S.W.3d 500, 507 (Tex. Crim. App. 2003) ("The fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury.").

Here, the excluded testimony was certainly of a graphic and important nature to Gotcher's defense, but he was still able to present his defense without it. We, therefore, evaluate

this error as nonconstitutional and evaluate harm based on whether it affected Gotcher's substantial rights.

Nonconstitutional error which does not affect an accused's substantial rights is harmless and must be disregarded. TEX. R. APP. P. 44.2(b). Substantial rights are not affected if we, based on the record as a whole, have a fair assurance that the erroneous exclusion of evidence either had no influence or only a slight influence on the jury. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In making our assessment, we consider everything in the record, the nature of the evidence supporting the verdict, the character of the alleged error, and how it relates to other evidence in the record. *Id.*

Gotcher's entire defense was that Ragsdale consented to Tuesday's sexual intercourse. In pursuit of that defense, he was able to produce considerable evidence that Ragsdale had shown sexual interest in him on Sunday. Tacka testified that, on Sunday, Ragsdale and Gotcher had had sexually charged contact and had together gone into Tacka's bedroom thereafter. Another person who testified to having been present that Sunday, Ricker, said that Ragsdale appeared "interested" in Gotcher, that she was "extra friendly with him," and that the pair was "touchy-feely." Ricker also testified that, at some point that Sunday, Gotcher and Ragsdale went into another room alone together. She had characterized Ragsdale as having been "all over that boy."[12]

While Gotcher was still able to present evidence of the Sunday encounter with Ragsdale to the jury, the description of oral sex by Ragsdale came in only through his testimony. Clearly,

---

[12]Ricker's testimony was presented after Tacka's testimony, in Gotcher's case-in-chief.

14

the jury did not believe Gotcher's testimony regarding the encounter on Sunday or regarding the ultimate he-said-she-said question, whether Ragsdale consented to Tuesday's sexual intercourse. Tacka's testimony—which was not allowed to extend to the oral sex—was, if believed, quite strong, especially when much of it was corroborated by Ricker. Tacka was allowed to testify that, on Sunday evening, Ragsdale was "all over" Gotcher, rubbed on him, put her hand in his pants, and, directly after those actions, accompanied Gotcher into Tacka's bedroom. The clear implication of Tacka's testimony, if believed, was that a consensual sexual encounter did occur between Gotcher and Ragsdale on Sunday evening. A jury that would believe Tacka's testimony about Sunday's events would likely also believe that Ragsdale consented to sexual intercourse with Gotcha on Tuesday evening, unless there was some significant intervening change in the relationship or in Ragsdale's attitude. Based on this record, without any significant evidence of a change in the relationship or attitude between Sunday and Tuesday, it appears that the jury simply did not believe Tacka's testimony concerning Sunday's events. The jury also disbelieved Ricker's and Gotcher's testimony about Sunday's events. The jury's disbelief that Ragsdale and Gotcher had a consensual sexual encounter Sunday would not necessarily decide the question of whether Ragsdale consented to Tuesday's sexual intercourse. In the final analysis, however, we are reasonably assured that allowing Tacka to testify, additionally, that Ragsdale performed oral sex on Gotcher Sunday evening would not make the jury any more likely to believe Gotcher's testimony that Ragsdale consented on Tuesday.[13] Therefore, we conclude that the erroneously

---

[13]In fact, adding to Tacka's permitted testimony the lurid claim that Ragsdale performed oral sex on Gotcher on Sunday evening, while somehow allowing Tacka to witness the act, might actually make Tacka's overall testimony not more, but less believable and thus make it even less likely that the jury would believe Gotcher's testimony that Ragsdale consented on Tuesday.

excluded testimony had little or no effect on the jury's decision. We overrule Gotcher's point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

DISSENTING OPINION

I respectfully dissent.

I concur with the majority's conclusion that the trial court erred in its preclusion of Tacka Gotcher's testimony that she had observed Janie Lynn Ragsdale, the complainant, performing fellatio on the defendant only two days before the incident giving rise to the charges against Gotcher. The issue of consent was clearly before the trial court at that time. My dissent deals, rather, with the result of the harm analysis employed. I believe that Gotcher's substantial rights were adversely impacted, and I also believe that the absence of this testimony had a great impact on the decision handed down by the jury. It is true that Gotcher was not prohibited from presenting his defensive theory that his sexual conjunction with Ragsdale on Tuesday night was mutually consensual. However, the jury quite likely found his testimony pertaining to the events two days before the incident giving rise to charges (i.e., Ragsdale showing Gotcher pictures from her telephone of her nude body, disrobing, and performing oral sex on him) to have been solely self-serving. Even though the jury was able to hear testimony from Tacka that Ragsdale had been acting very suggestively toward Gotcher and had even accompanied him alone into the

16

bedroom of the apartment, the defining feature of the conduct (the fellation of Gotcher by Ragsdale) screamed of consensual sexual activity between these parties only two days before the incident of which Ragsdale complains. The testimony of Tacka removed the relation of the culminating event on Sunday from the category of the "he said/she said" kind of story about the entire relationship between these two people.

In discussions of the issues in this case, the majority has placed Tacka's excluded testimony regarding oral sex in the same category as the other events leading up to that sexual act that Gotcher said occurred on Sunday. In essence, the majority indicates that if the jury had believed Tacka about what they heard of her version of the events on Sunday, they would not have convicted Gotcher of the event on Tuesday. I believe that conclusion diminishes the importance of the story of fellatio, an act I think would have had much greater significance and credibility when its story was related by both Gotcher and an independent person, Tacka.[14]

The probative nature of this testimony further amplifies the harm to Gotcher's substantial rights. As discussed above, Tacka's excluded testimony was quite probative because it was relevant to the issue of Ragsdale's consent to engage in sexual intercourse Tuesday night; it also went to Gotcher's intent, a fact of consequence. Gotcher had need of this testimony because, had Tacka been allowed to fully testify, she would have corroborated Gotcher's version of what happened Sunday. Though it is likely that Gotcher still may have needed to testify to unequivocally present his position that Tuesday's congress was consensual, if Tacka had

_____

[14]It should be noted that if Tacka had been allowed to testify, Gotcher's lawyer could have argued on closing that if Gotcher were to lie about the Sunday incident, he could have just as easily claimed that he and Ragsdale had gone the entire distance that Sunday afternoon and had fully engaged in sexual intercourse. The fact that he testified that the two stopped at the oral sex stage and there was independent evidence to corroborate that testimony strongly suggested its veracity.

17

testified, Gotcher could have refrained from taking the stand, and thus not allowed the jury to be privy to his relatively sordid criminal history.

Gotcher was prevented from fully presenting his defense. In *Billodeau v. State*,[15] the defendant was not allowed to question the complainant about threats the complainant made to accuse witnesses of "molesting" him. *Billodeau*, 277 S.W.3d at 38. Even though Billodeau's testimony contradicted the complainant,[16] he was not able to "fully present his defense" when he was not allowed to cross-examine the complainant about false threats the complainant had made to other parties (this to show the complainant's motive to testify untruthfully). *Id*. The defendant also was not allowed to present the complainant's denials of these threats, which then would have allowed the defense to present rebuttal testimony about the false threats. The Texas Court of Criminal Appeals found this erroneous limitation affected a substantial right and was harmful error. *Id.*

In *Hammer v. State*,[17] the defense was not allowed to cross-examine the complainant regarding claims that she had previously made false accusations against other persons to cover up the complainant's own sexual encounters with a boyfriend; and that she had accused multiple other persons of molesting her. This inability to fully present his defense affected Hammer's substantial rights and was harmful error. *Hammer*, 311 S.W.3d at 22.

---

[15]277 S.W.3d 34 (Tex. Crim. App. 2009).

[16]The opinion is not explicit: it says Billodeau contradicted the complainant, denying taking him to the motel where the alleged offense occurred. The appellant's testimony also contradicted other aspects of the complainant's testimony; from the context of the opinion it appears Billodeau denied the ultimate accusation. *Billodeau*, 277 S.W.3d at 37–38.

[17]311 S.W.3d 20 (Tex. App.—San Antonio 2010, no pet.).

I would hold that the trial court's limitation of Gotcher's ability to fully present his defense affected a substantial right, was harmful error, and warrants reversal. I respectfully dissent.

Bailey C. Moseley
Justice

Date Submitted:     April 10, 2014
Date Decided:       June 10, 2014

Publish